J. R. Swan, C. J.
It is proper to say, that the Supreme Court of the state in regular session have no more judicial *power or discretion, in determining questions which arise upon habeas corpus, than a probate judge of the county. Each must be governed by the same rules, and both are invested with the same powers — no more and no less.
The relators being brought before us on habeas corpus, our inquiry must be confined to such questions as are properly cognizable under that writ.
The affidavits of the relators, without disclosing the cause of their imprisonment, set forth that they were unlawfully imprisoned. The writs were of course issued upon those affidavits. The returns show that the sheriff of Cuyahoga county holds the relators in custody under a sentence and judgment of the district court of the United States, for the offense of rescuing fugitives from service.
The judgment of the district courtis conclusive, and precludes, all inquiry on habeas corpus, unless it is a nullity.
Waiving all questions made by counsel as to the power of a state judge, on such a summary proceeding, to declare the sentence of a court of general jurisdiction invalid, it is very clear that we can not go behind the sentence, and revise and review the previous proceedings of the court. For instance, if these relators had been tried by a packed jury, found guilty without sufficient proof, and upon an erroneous and illegal charge of the court, we could not set aside the verdict, arrest the sentence, or revise the judgment of the court. It would, indeed, be imputing to the counsel of the relators the wildest and most absurd views of the law to intimate that they claim, that a judge, on habeas corpus, can go behind a sentence, and review and revise the mode in which a trial was conducted. No such claim is made; but I refer to the subject, because those who are unacquainted with the limitations upon tho power of this court, are not probably aware, that a judge would *146 be guilty of high-handed usurpation, and would deserve impeachment, if he undertook, in such a proceeding as -this, to discharge the relators on any assumed Aground that they were not, in ■fact, guilty of rescuing fugitives from labor ; or that they did not .'have a lair and impartial trial.
JSIeither the verdict of the jury nor the judgment of the district •court can be collaterally impeached, if that court had jurisdiction •of the party and offense. The verdicts and sentences of courts in •every case would be subject to arbitrary intermeddling, and might be set aside and criminals discharged by any judge who is authorized by statute to issue this writ, if a case could be re-examined and the justice of the verdict and sentence considered on habeas corpus.
And further, if a court, having jurisdiction over an offense punishable by a valid and constitutional law, pronounces sentence, and the commitment under that sentence is returned on habeas corpus, the form of the indictment or the want’ of proper allegations therein, can not be inquired into ; for this process can not be converted into a writ of error. In such case the court, having jurisdiction over the offense, must itself pronounce the law of the case, and, until reversed by some competent tribunal, is conclusivo on all other courts, and puts an end to all collateral inquiry on habeas corpus. Ex parte Watkins, 3 Pet. 193; In the matter of Prime1 Barb. 341; In the matter of Shaw, 7 Ohio St. 81. Hence it is that the statute itself, relating to this writ, excepts from those who are entitled to the benefit of it, all persons convicted of a crime or offense, for which they stand committed, plainly and specifically •expressed in the warrant of commitment. Swan’s Stat. 450, sec. 1.
The district court, then, having by law, if constitutional, jurisdiction over the offense mentioned in the mittimus, and having pronounced sentence, it must be deemed conclusive on habeas •corpus. We are bound to take the return as true; and if the relators could, under any state of facts, be liable to imprisonment for rescuing an escaped ^fugitive, in violation of the seventh •section of the act of Congress of 1850, the relators must be remanded.
It is true that the officer procured and has returned with the mittimus a copy of the record. The mittimus itself, however, was and is his authority for holding the relators; it designates, with sufficient certainty, the cause of commitment; and the fact that the *147 officer has procured a copy of the record and annexed it to the mittimus, and made it a part of his return, does not alter our jurisdiction on habeas corpus. The district court has exclusive jurisdiction if it has any; and we can not revise, as upon error or motion in arrest of judgment, the sufficiency of the allegations of the indictment or of the facts contained in it. No one would claim that criminals, who had been convicted of murder in the second degree, and sentenced to the penitentiary for life, could be discharged on habeas corpus, because the indictment contained no allegation of a purpose to kill- — an ingredient of the offense which this court has held material and substantive, and which they have been unable to find in the forms of indictments heretofore used. So in this case, if, under any state of facts, a citizen could be indicted and punished, under the seventh section of the fugitive act, for rescuing a slave, although the other sections of the act, in respect to the mode in which escaped slaves may be reclaimed, were unconstitutional and void, we can not, on habeas corpus, look into the indictment found in a court authorized to pronounce sentence for such an offense, and discharge on account of the want of allegations which would have justified the court pronouncing the sentence to arrest the judgment,‘or an appellate court to reverse it. If Congress has the power to legislate at all, facts may exist in which the legal right of the owner is conceded even by the fugitive, independent of all legal proceedings, and rescuers might be convicted and punished under the seventh section of the fugitive act.
The only ground, therefore, upon which the relators can be ^discharged is, to go behind the seventh section of the act, and maintain that Congress never had any legislative power, under the constitution of the United States, to provide punishment for a person who knowingly and intentionally rescues an escaj)ed slave.
This position, if sustained by the court, cuts up by the roots all laws which have been passed, and all laws which may hereafter be passed by Congress, relating to the reclamation of fugitives. It not only disposes of this seventh section of the act of 1850, now under consideration, but the whole of the acts of 1793 and 1850.
Neither the ease before us, nor the question thus broadly presented, requires us to consider or determine the powers of the court to appoint commissioners, or the provisions of the law of 1850, *148 which have been the subject of discussion and condemnation, and which have so deeply agitated the public mind.
The question before us is, whether the seventh section of the fugitive law, under which these relators were sentenced, is a nullity, for want of legislative power in Congress, to pass any law whatever' relating to fugitives from labor?
It will be perceived, then, that we have no question before us connected with the facts upon which the prosecution against the relators was founded; or the mode of selecting the jury; or the proofs; or the mode in which the trial was conducted; or the errors or imperfections of the indictment; or the constitutionality of any part of the fugitive act, except the seventh section, upon which therelators were sentenced; and the only question under that section is, whether Congress have any legislative power whatever?
The subjects to which I have alluded, and which are not before-us, may have a deep meaning and an exciting interest to these relators and to the public. But they are not in issue, or the proper subjects of discussion or argument in the determination of the question before us. They *aro, indeed, trifling and evanescent, compared with the consequences which may result from the present action of this court; for, if these relators are discharged, it must be, I repeat, on the ground that the laws of 1793 and 1850 have always been void, and consequently that these and all other laws hereafter-passed, of any kind, will now and from henceforth be persistently resisted by the Stato of Ohio. I say, henceforth persistently resisted, because it will be found, I think, that the same adjudication which determines that Congress have no power to pass any law, determines also a precedent, that the construction of the constitution shall depend upon the shifting private opinions of every judge in every state, who is called upon to give it an interpretation, whatever maybe the decision of the Supreme Court of the United States,, and other courts of the Union.
It must be conceded that the power of Congress to legislate on this subject is as deliberately and fully settled by the decisions of the Supreme Court of the United States as any other constitutional, question that has been presented for their determination. Moore v. State of Illinois, 14 How. 13; Jones v. Van Zandt, 5 How. 215; Prigg v. Com. of Penn., 16 Pet. 539; United States v. Booth, 21 How.
That court have held, unanimously, that inasmuch as the constitution of the United States secured by express provision the right *149 to the reclamation of escaped slaves, the obligation to protect and •enforce that constitutional right devolves upon the general government. On the other hand, it has been insisted, that the rights of the master to his fugitive slave must bo left to such legislation of the different states as they may deem just and expedient, and that the national government are powerless to vindicate or protect his •constitutional rights; others are of the opinion that the power to legislate is concurrent in Congress and in the states; others, that the constitution of the United States confers all the power necessary upon owners of slaves for their reclamation, and that, therefore, neither ^Congress nor the states can legislate; others, that the amendment to the constitution, which secures freedom of religious belief, makes the provision in relation to the reclamation •of slaves subordinate to it, and, by implication, of no obligation •upon those who believe slavery a sin.
The Supreme Court of Massachusetts have very fully discussed -this question, and also the constitutionality of the fugitive slave Jaw of 1850, and held that Congress had authority to pass a fugitive slave act. Thomas Sim’s case, 7 Cush. 285; Commonwealth v. Griffith, 2 Pick. 11.
The Supreme Court of Pennsylvania (Cauffman v. Oliver, 10 Barr. 514: Wright v. Deacon, 5 Serg. & Rawle, 62); the Supreme Court and court of appeals of the State of New York (Jack v. Martin, 12 Wend. 311; Same Case, 14 Wend. 509; Ex parte Floyd v. The Recorder of New York, 11 Wend. 180; Glenn v. Hodges, 9 Johns. 67); the Supreme Court of Indiana (Graves v. The State, Smith (Ind.) 258; 1 Carter, 368; Johnson v. Vanamringe, 2 Blackf. 311); the Supreme Court of Illinois (Thornton’s case, 11 Ills. 322; Eells v. The People, 4 Scam. 498; Fanney v. Montgomery, Bre. 188); the Supreme Court of California (In re Perkins, 2 Cal. 424), have all recognized the power of Congress to enforce, by legislation, the reclamation of escaped slaves.
The judges of the Supreme Court of Ohio, in 1845-46, were Justices Wood, Bichard, Reed, and Hitchcock. Three of these judges had this subject before them. The Supreme Court, in 1846, in regular session in Cuyahoga county, held by judges Wood and Bichard, brought before them on habeas corpus one Richardson, who was ■in custody on a charge of kidnapping; he having knowingly aided •to carry one Berry, an escaped slave, out of the state, without taking him before a jury or justice of the county, and there estab* *150 lishing his right of property in Berry, agreeably to the laws of the United States. This was punishable as kidnapping by the laws ■of this state, passed in 1831. 29 Ohio L. 422; Swan’s Stat., ed 1840, *600. The court, after referring to the decision of the Supreme Court of the United States, that all legislation on the subject of the reclamation of slaves is enclusively in Congress, held that the act in question, upon which Richardson was imprisoned, Was null and void, under that decision of the Supreme Court of the United States. 9 Law Rep. 316.
The power of Congress to legislate was very ably discussed, and Was fully recognized by Reed, justice of the Supreme Court of Ohio, in 1845, in the case of The State v Hoppess, on habeas corpus. 2 West. Law Journal, 279.
The cases to which I have referred will be detailed, and the rulings of the court discussed, by my brother, Peck.
I have examined, with some care, the reports of the decisions of the other states, and have been unable to find a single decision of any Supreme Court of any state in the Union, denying to Congress the power to legislate upon this subject.
The cases decided by the Supreme Court of Wisconsin, have been cited as an exception to this uniform and unbroken current of authority sustaining the legislative power of Congress.
One of the three judges which compose that court held, that the fugitive slave laws were unconstitutional and void; but the majority of the court did not participate in that opinion, hut discharged the relator on the ground that the offense charged in the indictment did not contain a .sufficient description of the statutory offense described in the fugitive law of 1850.
The general assembly of the State of Ohio have also repeatedly recognized, in statutes of the state, the fugitive slave law of 1793, as operative and in force. Swan’s Stat., ed. 1840, 599, 600, secs. 22, 27; 54 Ohio L. 221.
But treating this question as if no decision had ever been made by the Supreme Court of the United States or by any court of the-free states, how does it stand ?
If .the constitution of the United States had not been formed, *and a union of the states thus created, each, as distinct states, would have had the right, under the fundamental law of nations, to have decided for itself upon its own internal condition and regulations, in its own territories. If any of them, while thus *151 responsible alone to their own people, had introduced slavery, other nations or states would have had no just right to interfere, nor would the people of foreign states be responsible, politically or morally, for it. The constitution of the United States was framed, and the union perfected, subordinate to, and without violating the fundamental law of nations, to which I have alluded; and it would, therefore, have been in vain for the government of a free state to' insist that they would enter into no compact, because slavery is wrong and unjust. The people and government of no state of this Union are responsible, politically or morally, for the domestic institutions or regulations of the others.
In the compact of the Union, the framers of the constitution guaranteed to the owners of escaped slaves the right of reclamation. It is made part of the constitution; the whole irrepealable j and to be changed only by the power that made it, in the form prescribed by it.
It was designed.to be a practicable and peaceable mode by which a fugitive from service might be delivered up. It can not be extended by implication; the fhgitive must not only owe service or labor in another state, but'must have escaped from it. This is the extent and the limit of the right of the master.
The constitution of the United States went into operation in March, 1789.
In 1793, the second Congress elected under the constitution of the United States, and composed of many of the members of the convention which framed the constitution, passed an act providing for the rendition of fugitives from justice, and a summary mode for the reclamation of fugitives from labor. By this act, rescuers, obstructers, and *harborers of escaped slaves, were to be visited with a penalty not exceeding five hundred dollars.
No jurist will deny, that if Congress can provide a penal forfeiture for an alleged violation of law, as in the act of 1793, they have the legislative power to superadd imprisonment for the same offense, as in the act of 1850. No court can pronounce the one constitutional and the other without legislative authority.
This law of 1793 was passed by Congress without any traces in history of constitutional objection ; has been ever since that time, by every department of the government, national and state, not only received and acquiesced in as the law of the land, but in active, practical operation throughout every state in the Union. *152 Enacted at the commencement of our government, it has been in operation for sixty-six years.
It is conceded by the counsel for the relators, that if Congress have no power to legislate on this subject, they never had any power to legislate upon the subject of fugitives from justice. The same reasons for holding that the one is a usurpation of legislative power, is equally fatal to the other. Both stand precisely on the same ground.
The executive departments of the states of the Union have, I believe, acted upon, and I am not aware that any have denied, the constitutionality of the law of Congress for the rendition of fugitive criminals.
It may now be well asked, if such a long period of recognition and acquiescence in the existence of a law is to be disregarded, and the law itself annulled, whether there be anything in our government so settled and stable as not to be liable to attack a.nd overthrow, to vacillation and change; and if, after this lapse of time, a new and yet untried experiment upon this and all other irritating questions of constitutional law is to be entered upon, and a precedent set by the judges of this court, that no question can be put to rest by time or acquiesence, when will the construction of the constitution be settled, and the landmarks *of the several departments of the government and the states be permanently fixed ?
But superadded to this, we have an unbroken and uniform current of judicial decisions, recognizing the legislative power of Congress upon this subject to the present time.
If its authority is now tobe resisted by the state; if her government is to repel by force, now and hereafter, the authorities of the United States in the execution of any and every law upon this-subject, does it become the official conservators of the public peace to bi’eak through those judicial sanctions which guide and limit their personal discretion and are the only safeguards against their own arbitrary and capricious tryanny, and be the first to initiate and organize súch a civil commotion?
I am of the opinion, and I think the calm judgment of others will concur with me in the opinion, that in view of these decisions of the Supreme Court of the United States settling the power of Congress; in view of the adjudications of the courts of the freo states affirming the same power; in view of the acquiescence of all *153 ■departments of the national and state governments during two gen■erations, the judges of a state court have no judicial right to interpose their own individual opinions upon a question thus disposed -of, change the interpretation to what they believe it should be, overrule the adjudications of the Supreme Court of the United States and the state courts, strike down the legislative power of -Congress now and from henceforth, resist, and persistently, on the authority of their private judgment and judicial discretion thus assumed over the interpretation of the constitution of the United ■States, the future exercise of all authority by every department of the national government, and force upon the State of Ohio and its people the maintenance of the authority of their own individual •opinions as constitutional law.
It is said by the counsel for the relators, that these are *two •separate cases of habeas corpus, in which the court simply discharges two persons from what it thinks unlawful imprisonment; that the decision may be reversed, on error, by the Supreme Court •of the United States, and there end. We do not think so. If we discharge these relators upon the principle that Congress have no power to pass any fugitive law, that principle becomes instinct with life and action throughout the State of Ohio, gigantic in dimensions .and state governmental force, imperatively demanding obedience from every citizen and officer of the state and national government .as the supreme law of the land, and practically nullifying any law hereafter enacted by Congress, however constitutional in its detailed provisions it may be.
It is not simply these relators this court is dealing with, but also •constitutional law. These prisoners can only be discharged by this >court declaring that Congress have no power to legislate. If this •court say that, do they mean it only as to these relators, and that the acts of Congress have operation and effect in Ohio as to everybody else? And if, after striking down the legislation of Congress in this case, will the court wait until the Supreme Court of the United States have reversed their judgment, before giving force .and effect to the law of this case? If this court hold that the acts •of Congress are void, they are inoperative and practically void, as if never enacted, from that moment, through every department of the state government, whenever and however the question may arise. As to the national government, throughout all its departments, the power of Congress to legislate will be acknowledged, *154 and the laws held valid and in full force and binding obligation! upon the people of Ohio, notwithstanding the decision of this court to the contrary, and whether a writ of error is sued out in this case’ to reverse our decision or not.
But it is said that the national government would be content to permit the laws of Congress to remain inoperative *and nullified in Ohio until their constitutionality could be examined into' and decided by the Supreme Court of the United States.
Perhaps they would; for great forbearance is due from each sovereignty. But I am somewhat surprised that those who are so anxious for this court to utterly disregard and repudiate, and practically reverse, the decisions of the Supi’eme Court of the United States and the decisions of the state courts, should so mildly look to that court to revise our decision, and settle what has» already been settled and declared by that court to be without doubt or question.
I do not perceive how it can be seriously asserted that there is. any question in this case which the Supreme Court of the United States would deem an open one for consideration or adjudication;, nor can I perceive, if the decisions of the Supreme Court are now to be disregarded, why they may not continue to be disregarded; and while the United States are engaged hereafter, from year to year, in obtaining the barren fruits of reversals of the decisions of our state tribunals, the legislative power of Congress may not in the meantime be persistently denied, and repudiated indefinitely.
When will this happy state of friendly litigation in the Supreme Court of the United States begin, if, in the meantime, the power of Congress is denied and resisted as a usurpation, by the State of Ohio ? Is the duty of the national government less imperative to enforce her authority and resist what she believes usurpation than that of the state government?
But there is a very important political view of this question’ which should not be overlooked. No governmental rule can be evolved by construction from the constitution of the United States without practically becoming a part of the constitution itself'. Thus, if, in Ohio, no laws of Congress can be operative for the reclamation of slaves, but laws on that subject may be piassed by the general ^assembly; and in Illinois, and the other free states which have acknowledged the decision in the Prigg case, laws enacted by Congress are to be exclusively operative, and the *155 laws of their state legislatures void; if no tariff law can be operative in South Carolina, but such law everywhere else valid; if in Mississippi and Alabama the law against the slave-trade is hold unconstitutional and void, and in every other state enforced, it will be seen that the constitution, by interpretation, will become somewhat different in the different states. Now, if this can be done as. to one provision of the constitution, it can be done as to all others. If each state may construe it in its own way, to promote its own local interest, what will the constitution of the United States become, but a hydra of more than thirty heads, uttering Babel and conflicting commands, such as each state in its own jurisdiction, may deem it expedient to obey, or party strife may demand ?
That this state of things was foreseen by the framers of the constitution of the United States, no one denies. That there is some-remedy provided for it, all admit. The extent of that remedy has sometimes been questioned, and I do not propose to discuss it.
The constitution of the United States declares: “ That the constitution, and laws of the United States made in pursuance thereof, shall be the supreme law of the land, and the judges in every state-shall be bound thereby, anything in the constitution or laws of any state to the contrary notwithstanding.” This was the first step. The next was, providing for a judicial department in the general-government, and declaring that “the judicial power shall extend to all cases in law and equity arising under this constitution, the-laws of the United States, and treaties made,” etc. Art. 3, sec. 2.
Now, with respect to the boundary of jurisdiction between the federal and state governments, I do not desire to say anything but. this, that when Congress has undertaken to enforce, by legislation, a right guaranteed by the ^constitution itself, and after the power has been recognized by all the highest judicial tribunals of the states of the Union before whom the question has been presented, has been acquiesced in by the country for sixty-six years and, superadded to these circumstances, the federal tribunal, in cases arising under the constitution, has repeatedly held that Congress have the power, it is too late for the judges of the courts of Ohio, upon their private judgment, to deny the power.
Again, to maintain our right to do so, we must hold: 1. That, we have the power under the constitution to determine this question in direct conflict with the settled interpretation of the Supreme Court of the United States; 2. That we have a right to maintain,. *156 by the powers of every department of the state government, our interpretation of the constitution, and to exact obedience thereto as well from United States officers as from all the citizens of Ohio ; 3. That this power, on our part, we have a right to exorcise, when it happens that a majority of our judges are intellectually satisfied, -beyond any reasonable doubt upon their minds, from a review of the grounds upon which the federal tribunal and others adopted an interpretation of any provision of the constitution of the United States, that they wore mistaken ; 4, and lastly. As we must maintain that we have the judicial right to overrule their previous -adjudications and enforce obedience to our own, which are in conflict with theirs, so, subsequent decisions on error, overruling ours, not being intellectually satisfactory to us, we may, in the exercise of the same judicial right and power, disregard them. For, the idea of first asserting the power to ovei-rule their interpretation be•cause we believe it ex'roneous, and afterward submitting to it, although still believing it ex-roixeous, would be a most undignified and puerile assumption of temporary power, unworthy of a great state ■or its judicial tribunals, merely creating agitation, and ending in ■nothing but submission.
*If the individual opinion of every judge is to become the exponent and construction of the constitution of the United States whenever he feels cex’tain that he is right,- without regard to the ■decisions of the highest tribunals of the country, then the individual opinion of every judge is the constitution, not only to himself, but, for the time being, to the country. This, it seems to me, is ■simply discretion without rule, guide, precedent, or limitation — unstable, capricious despotism.
Is there any judicial incident more commoxi than for a judge to deny himself the individual discretion of declaring what he thinks even the unwritten law of the land should be,. and hold his judgment amenable to the law as it has been decided ? And is the constitution to be less stable than the unwritten law ? Is a judge to treat the settled interpretation of the constitution, amxoixnccd to the country in a previous generation, by Congress assuming to legislate, sanctioned by an unbroken current of judicial decisions, as of no binding judicial obligation, and to be overthrown by the authority of his individual convictions that the constitution should have a different interpretation ? Aixd if a state judge can thus, by his interpretation, alter the constitution when it has received such *157 acquiescence and sanction, what provisions of the constitution, state- or national, are safe from change and alteration, under the assumption of such judicial power ? They would be written upon sand.
For myself, I disclaim the exercise of any such judicial discretion.
Two governments, state and national, over the same people, each exacting obedience within the sphere of its own sovereign powers, could not be adjusted without occasional conflict. But such a government, of more than thirty sovereign states, each jealous of the powers of the national government, each interpreting for itself the powers of the national sovereignty and its own, and the national sovereignty interpreting theirs, and claiming powers *denied to it by the states, each clashing and conflicting, and all demanding and enforcing obedience from the same people to their inconsistent, supreme, and contradictory commands — such a government could have no permanence and would not deserve it. It would be the worst of all governments. If the federal judiciary is not the arbiter, created by the constitution, to bring order and uniformity out of such confusion and anarchy, there is none.
It is true, the judicial department of the national or state government might, under pretense of an interpretation of the constitution be guilty of a palpable violation of its provisions, demanding the-impeachment and condign punishment of the judges; and it might be the duty of every other constituted power of the state and of the people to resist such treasonable practices.
And even conceding that it would be the duty of a state to deny the authority of the Supreme Court of the United States to enforce upon a state an interpretation of the constitution which palpably and clearly violated reserved rights or state sovereignty, is there anything in the history of the act of Congress of 1793 ; the quiet and almost unanimous adoption of it by Congress; its long-c.ontinuod operation without objection to the authority of Congress to-legislate; no state, after the lapse of sixty-six years, denying the legislative authority; recognized by every state in which the question has been raised; is there anything, I say, under these circumstances, that can justify a state court disregarding the settled-interpretation of the Supreme Court of the United States, and resisting the authority of the national government?
It was said by Mr. Madison, “ It may be a misfortune that in organizing any government, the explication of its authority should be left to any of its co-ordinate branches. There is no example in. *158 ¡any country where it is otherwise.” 3 Elliott’s Debates, 532. And, I may add, it can not be otherwise without intestine war and civil -commotion.
*The sense of j ustice of the people of Ohio has been shocked by some of the unjust provisions of the fugitive acts. It is not the authority of Congress to legislate that, they deny, but it is the .abuse of the power.
That abuse may be remedied by Congress. And if the power to legislate is denied, the question can be put an end to bjr repeal — it is the only constitutional mode left; the other alternative is intestine war and resistance of our national government.
All must admit that the owner of escaped slaves is entitled to ■their reclamation. Good faith to sister states demands it; and there would be no resistance in Ohio to a fair and just law effecting that object. No intense public feeling could be excited upon the •question as to who should legislate, Congress or the states, if a proper law were passed by Congress.
For myself, as a member of this court, I disclaim the judicial •discretion of disturbing the settled construction of the constitution of the United States; and I must refuse the experiment of initiating •disorder and governmental collision, to establish order and evenhanded justice.
I do not repeat here the judicial arguments sustaining the power of Congress, which have been pronounced by some of the soundest .and wisest judges that have adorned the American bench ; for it is my deliberate and confident conviction that the question has by time, acquiescence, and adjudication, passed beyond the reach of judicial consideration of preponderance of argument; certainly beyond the reach of question before this court.
As a citizen, I would not deliberately violate tho constitution or the law by interference with fugitives from service. Eut if a weary, ■frightened slave should appeal to me to protect him from his pursuers, it is possible I might momentarily forget my allegiance to the law and constitution, and give him a covert from those who were upon his track. There are, no doubt, many slaveholders who would thus follow the impulses of human sympathy ; and if I *did it, and were prosecuted, condemned, and imprisoned, and brought by my counsel before this tribunal on a habeas corpus, and were then permitted to pronounce judgment in my own case, I ¡trust I should have the moral courage to say, before God and the *159 country, as I am now compelled to say, under the solemn duties of a judge, bound by my official oath to sustain the supremacy of the constitution and the law, “ The prisoner, must be remanded.”
Scott and Peck, JJ., concurred.
Brinkerhoep and Sutlipp, JJ., dissented.
Peck, J.
The relators in both these cases, in their applications, allege that they are now illegally restrained of their liberty by the sheriff of Cuyahoga county, and seek deliverance from that restraint. It appears from the return of that officer, that the relators .are now in his custody under and by virtue of a mittimus, issued out of the United States district court for the northern district of Ohio, reciting that the relators had severally been convicted before that court, upon indictments “ for rescuing a fugitive from service,” and sentenced to imprisonment in the jail of Cuyahoga county for a term yet unexpirod. To a copy of the mittimus and the United States marshal’s order for his reception of the relators, the sheriff has also in each ease appended a certified copy of the indictment and the subsequent proceedings thereon.
1 The relators claim to be discharged iu this summary proceeding, because the law of Congress upon which the prosecution before said district court was based, is, as they assert, unconstitutional and void, and the judgment and sentence of the district court, for that cause, a perfect nullity.
The unconstitutionality of the law of Congress of September 18, 1850, for the reclamation of fugitives from service, is affirmed by the relators upon two principal grounds :
*1. That the Congress of the United States have no eonstitutional power to pass any law upon that subject.
2. That if Congress had power to pass a law in regard to fugitives from service, it had no constitutional authority to pass such a law as that of 1850 ; and,
3. The relators also claim that, even if the law of 1850 is constitutional and valid, they are still entitled to be discharged, because the indictment appended to the return does not charge, substantially, any offense under that act; and that, therefore, the district court had no jurisdiction to hear and determine the truth or falsity of the charge spread upon its face.
The first question, then, is, whether, under the constitution of the *160 United States, Congress has any power to legislate in reference to-the reclamation of fugitives from service.
The clause in the constitution of the United States (art. 4, sec. 2)-upon which the laws of 1793 and 1850 are based, reads as follows:
“ No person, held to service or labor in one state under the laws thereof, escaping into another, shall, in consequence of any law or regulation therein, be discharged from such service or labor, but shall bo delivered up on claim of the party to whom such labor or service is due.”
It is unnecessary to inquire whether undue importance has, heretofore, been attached to the insertion of the clause above quoted into the national compact, .and as to its influence in procuring the adoption of that instrument. All the earlier judges, state and' federal, some of whose antecedents were prior to the revolution, in-commenting upon this clause and the causes which led to its insertion, have declared that, unless this clause or some other of similar-import had been inserted, a portion of the states would have declined to adopt it; while, latterly, some who rely mainly upon the written record, have intimated that it was by no means regarded at the time by the people of *lhc south as of much, and certainly not of paramount, importance. A careful perusal of the “History of the Origin and Formation of the Constitution,” etc., by Curtis, and the supplement to Elliott’s Debates, will satisfy every one, at all familiar with the history of the times under the confederation — the diversities of population and pursuits- — -the difficulties-which had then arisen, and those which might be reasonably apprehended in the future — that the provision for the reclamation of fugitive slaves was deemed by many of the members, and those they represented, of great, if not of vital importance, and contributed largely to its adoption by some'of the southern states. He will also be satisfied that, if any legislation was required, in order to carry the provisions of that clause into effect, the framers of that, instrument could not, from the nature of the interests involved, the difficulties before that time encountered, and those which might reasonably be anticipated in the future, have designed or intended to commit such necessary legislation to the states. Interpreting this clause in the light of the surrounding circumstances, he would entertain no doubt but that this clause had a material effect in procuring the adoption of the constitution, and that all necessary legislation in regard to it ought to have been, and was by them *161 supposed to be, committed to the national and not the state legislatures.
At the second session of the second Congress convened under the constitution, eompcsed in part of those who had been also members of the convention, such a law was, in fact, passed and has ever since remained upon the statute-book, recognjzed and acquiesced in by all.
This law, then, being the law of February 12, 1793, respecting fugitives from service, may be and has been hitherto' very properly regarded as a contemporaneous exposition of the constitution by those who framed it, and as establishing an acquiescence in that exposition of more than two generations of those wlio were bound by the ^compromises of that instrument. Most, if not all, ' the objections now urged against the constitutionality of the act of September 18, 1850, if well founded, will also apply to the law of February 12, 1793, of which mention has already been made. By that act, the Congress of the United States assumed to legislate as to the reclamation of fugitives from labor. By that act, provision was made for the seizure and delivery of such persons to the owner, in a summary manner, and without a jury trial in the state where seized. By that act, justices of the peace and other state' officials wore authorized and empowered to perform the same or similar duties to those required by the present law of the commissioners of the circuit court, although those officials were officers unknown to the federal constitution, and derived their authority to act solely from the law of 1793. And lastly, by that act, a penalty of 8500 was imposed on any one who obstructed the owner in the recaption of his fugitive slave, besides subjecting him to general damages at the suit of such owner. It would seem to follow, then, that if the law of 1850 is unconstitutional for any of these reasons, that of 1793 would be equally so, the provisions of both laws being similar in principle, though that of 1850 is more severe in its sanctions. It may not be amiss, therefore, to inquire how that law has hitherto been regarded, especially in reference to the main question — the right of Congress to legislate at all upon the subject of fugitive slaves. The gravity of the question, and the pertinacity and warmth with which the unconstitutionality of the law has been maintained, must bo my apology for a more extended notice of the authorities than would be proper under other circumstances. In doing this, I propose to confine myself mainly to the decisions and *162 trulings of the state tribunals in -which the validity of the law has Ibcon eonsidoi’od and adjudicated.
The first reported case involving the validity of the act of 1793 was that of Glenn v. Hodges, decided by the Supreme Court of the State of New York, in a. d. 1812, and ^reported in 9 Johns. 67. This was an action brought by the master .of a slave who had escaped into Yermont, against one who had aided in his rescue there, and the action was maintained under the law of 1793. No doubt seems to have been entertained as to the legal validity of the act of Congress, and it is a little remarkable that the first reported decision, in which the benefits of this law were claimed and accorded, should have been that of a slave owned and held to service in the State of New York, showing that this clause in the constitution was general, and not sectional, in its application.
The next case, in the order of time, is that of Wright v. Deacon, decided by the Supreme Court of Pennsylvania, in a. d. 1819, and reported in 5 Serg. & Rawle, 62. In this case, the constitutionality of the law was fully sustained by Chief Justice Tilghman, who dismissed a writ of de homine replegiando, sued out by the fugitive against his captor, and denied him a jury trial in that slate, but left him to sue for his freedom in the state from which he had fled, remarking that it plainly appeared, “ from the whole scope and tenor of the ■constitution and act of Congress, that the fugitive was to be delivered up, on a summary proceeding, without the delay of a formal trial in a court of common law.”
The next case, in the order of time, is that of Commonwealth v. •Griffith, decided in 1823, by the Supreme Court of Massachusetts, and reported in 2 Pick. 11, upon full deliberation, and in which ■Oh. J. Parker, in delivering the opinion of a majority of the court, held the law of 1793 to be constitutional, and that the caption of a slave without warrant was not in conflict with the fourth amendment to the constitution, prohibiting unreasonable seizures, holding .that the slaves are not parties to the constitution, and that the amendment has relation only to parties to that instrument. Judge 'Thacker, in his dissenting opinion, does not question the validity .of the law, but expressly admits that Congress might pass a law prescribing *a new mode of seizure, which would supersede all state legislation on the subject. He dissents, because he is of opinion that the law of 1793, being silent as to the manner of seizure, left it to be regulated by the laws of the state, which, in that in *163 stance, had not been pursued. This, then, may be regarded as a unanimous affirmation, by the Supreme Court of Massachusetts, of the right of Congress to legislate as to fugitives from service; and it is to be borne in mind that Judge Thacker was one of the seven members of Congress who voted against the passage of the law of 1793, and his opinion indicates that his opposition to its passage was for some other reason than a belief that Congress had no constitutional power to pass it. And the chief justice also remarked, that the construction, then given by the court to the statute, had been adopted by the district court of that state, ever since the federal court went into operation.
In a. n. 1834, the Supreme Court of New York had the question again before them, in the case of Jack v. Mary Martin, 12 Wend. 311, which was affirmed by the court of errors, 14 Wend. 507, and in which Nelson, J., on the part of the court, delivered a very elaborate opinion, holding the law to be constitutional in all its parts, and that the right to legislate on the subject, belonged exclusively to Congress; and, further, that, even if the state legislatures had had a concurrent right to legislate, it would have been superseded by the exercise of that right by Congress. This decision was affirmed by the court of errors, in 14 Wend., supra. Chancellor Walworth, however, in an opinion delivered by him in the court of errors, and in which he concurs in the judgment of affirmance, on the ground that the right of the master is secured to him by the constitution itself, expresses doubts as to the authority of Congress to legislate upon the subject. This is the first instance I have been able to discover in which the power of Congress, to legislate as to thereclamation of fugitives from service, was judicially questioned.
*In 1836 the Supreme Court of Massachusetts, in the case of Commonwealth v. Aves, 18 Pick. 219, again recognize the fugitive slave act of 1793, as of binding force and obligation.
During the same year, Ch. J. Hornblo'wer, of New Jersey, in discharging from arrest a person in custody for an alleged violation of a law of the State of New Jersey, as to black and mulatto persons, expressed doubts as to the validity of the act of 1793, on the ground of a want of constitutional power to pass it, and also of the validity of the act of New Jersey; but declined to declare either law invalid, and finally discharged the prisoner, because the proceedings did not conform to the requirements of the act of the State of New Jersey.
*164 Such appears to have been the course and effect of the decisions; in the state courts, prior to the celebrated case of Prigg v. State of Pennsylvania, decided by the Supreme Court of the United States, in a. d. 1842, and reported in 16 Peters, 608. Prior to this decision,, the validity of the la-w had been affirmed by the Supremo Courts of New York, Pennsylvania, and Massachusetts, to say nothing of the numerous decisions, affirming its constitutionality, in the circuit and. district courts of the United States, and had not been denied in any, nor even doubted, except by the Chancellor, in 14 Wendell, and Ch. J. Hornblower, as above stated.
Perhaps those very doubts led to the reservation of the Priggcase, in order that the question might be settled by the court, which, at that day certainly, was considered as the court of dernier ressortr in questions arising under the constitution and laws of the United States. Though, nominally, a case between Edward Prigg and the. State of Pennsylvania, it was really a controversy between two of the original parties to the constitution and its compromises, the states of Maryland and Pennsylvania, and was taken to the Supreme Court, by their mutual desire and consent, and to settle and determine the force and effect of the ^compact to which they were parties. A “pro forma ” judgment was, by consent, entered in favor of the State of Pennsylvania, in the Supreme Court of that state, and a writ of error prosecuted, in the Supreme Court of the United States, to reverse it. The case, as is well known, was very ably argued before that court, and considered with all the gravity and research its importance required. Eight of the nine judges composing that court, affirmed the constitutionality of the act of 1793;. while Baldwin, J., though concurring in the reversal of the judgment, was of the opinion that Congress had no pewer to legislate,, as the provision itself conferred upon the owBer all the rights of seizure and removal which legislation could impart.
It forms no part of my present purpose to examine, in detail, all the points ruled in this case, or the reasons by which the several judges sustained and enforced their conclusions. For several years this case, which was prepared for that purpose, was regarded as a final settlement and adjudication of the constitutionality of the act of 1793, not only in the courts of the United States, but also in the courts of the several states, and was submitted to and acquiesced in. by all.
In February, A. d. 1845, in the case of State v. Hoppess, in habeas *165 «corpus, tried before Eead, J., of th'e Supreme Court of this state, .and reported in 2 West. Law Jour. 289, that learned jurist, in very clear and forcible language, upheld the constitutionality of the law of 1793, and in regard to the right of Congress to legislate on the .subject of fugitives from service, which power had been denied in the argument, he uses the following language: “ When the constitution of the United States imposes a duty or secures a right, Congress is empowered to enact such laws as are necessary to enforce the one and secure the other.”
And, in 184.6, the Supreme Court for Cuyahoga county, held by Justices Wood and Birchard, in the Richards case, reported in 3 West. Law Jour. 563, recognized and followed the decision in Prigg v. State of Pennsylvania, *and upon its authority dis•charged Richards, then in the custody of the sheriff of Cuyahoga county, for aiding in the removal of a slave from the state, without having taken the preliminary steps required by the law of Ohio in .such cases, holding, upon the authority of that case, that the law of this state was unconstitutional, and the legislation of Congress ■exclusive.
In a. d. 1848, the Supreme Court of Pennsylvania, in Kauffman v. Oliver, 10 Barr, 514, again held the law of 1793 to be constitu-' tional and valid, and also recognized the decision in the Prigg case as the settled law.
In 1849, the Supreme Court of Illinois, in Thompson’s case, 11 111. 332, decided that a law of that state, manifestly in aid of the master’s right of recaption, was unconstitutional; placing their .decision upon the authority of the Prigg case, and thus affirming its doctrines that the states can not legislate on the subject, and that Congress has the exclusive right to do so.
In the same year (1849), the Supreme Court of Indiana, in Graves v. State, 1 Carter (Ind.), 369, recognize the decision in the Prigg case as settling, definitively, that the right to legislate as to .fugitives from service is vested exclusively in Congress, and, upon the authority of that decision, held a law of that state, respecting such fugitives, to be unconstitutional and void.
The same court, in Donnell v. State, 3 Porter (Ind.), 480, again ruled the law of that state unconstitutional upon the same authority.
After the passage of the act of September 18,1850, the Supreme Court of the State of New York, in Henry v. Lowell, 16 Barb. 268, and the Supreme Court of Massachusetts, in the Sims case, 7 Cush *166 285, again adjudge the laws of 1793 aiid 1850 to be constitutional, and both those courts, in learned and able opinions, cite with approbation the decision in the Prigg case, and base their decisions in the cases stated, in part, upon its' authority. I have, thus far,, purposely refrained from referring to the ^numerous decis- j ions in the United States courts, at Washington and on the circuit,, which have uniformly maintained the validity of the acts of 1793 and 1850; those of the state tribunals being ample and satisfactory, and the question, in some degree, being a controversy between the state and national authorities.
Only one of the three judges composing the Supreme Court of' Wisconsin (Justice Smith), decided the act of 1850 unconstitutional for want of authority in Congress to legislate as to fugitive slaves. Justice Crawford held the act constitutional, while Chief Justice Whiton, who united with Justice Smith in declaring it unconstitutional, seems to concede that, at this late day, Congress must be held to have the power to legislate; but he relies for its-invalidity on its attempting to confer judicial powers upon commissioners, and depriving the fugitive of a trial by jury. On the-mere score of authority, then, discarding, for the time, the decisions of the courts of the United States, and ignoring the fact that, this Wisconsin decision has been reversed by a unanimous judgment of the Supreme Court of the United States—in United States v. Booth, 21 How. 506—it would seem that the law of 1850, as well as that of 1793, must be adjudged constitutional. The Supreme-Court of Massachusetts, in a very elaborate opinion delivered by Chief Justice Shaw, have held it constitutional in the very aspects in which it has been assailed by a divided court in Wisconsin. On the one hand, we have this Wisconsin decision and the doubts expressed by Chief Justice Hornblower and Chancellor Walworth; and on the other, a long and unbroken line of decisions, both state and national, affirming the validity of these fugitive slave laws. Is no construction of the constitution ever to be regarded as settled — as no longer an open question — as “ res adjudicata?” The counsel for relators say, never until it is settled right, which means, I suppose, never until settled as they think to-be right; and then those who think differently, must agitate the
question anew, until *they, in turn, obtain a decision of •which they can approve. Is each succeeding generation, ignoring what has heretofore been done and is now doing upon the author *167 ity of that instrument, still to regard it as a mere abstraction ? — a creature of the present, but not of the past? — as now existing, but without a previous history? Are we to determine the scope and effect of its provisions; the nature and extent of the powers it creates, and the rights it secures, from the mere terms employed, regardless of the practical construction placed upon it by the two generations which have preceded us?
It is said, in argument, that most of the points ruled in the Prigg case were not necessarily involved in the case tried, and that the decision upori those points, though entitled to respect as the opinions of eminent jurists, is not of binding authority. To a certain extent, this is true; but in estimating the weight to be attached to those rulings, we should not lose sight of the fact that the suit .was brought before that court by the joint act of the sovereign states of Pennsylvania and Maryland, two of the par-ties to the constitution, and who desired to have its construction settled. They were the real parties, and their object not merely the adjustment of the responsibilities of Edward Prigg, but to ascertain the effect of the constitutional provision, and the validity of the act of 1793, and of the statutes of Pennsylvania. The points were all very fully and ably argued, and decided after much deliberation. The same points were again argued, three years after, in the case of Jones v. Van Zandt, 5 How. 315, and with the same result, the law being again held constitutional and valid; and the court near the close of its opinion, to put the question at rest, uses this expressive language: “ That this act of Congress, then, is not repugnant to the constitution, must be considered among the settled adjudications of this court.” And now, in the late case of United States v. Booth, 21 How. 506, the court unanimously hold “that, in its judgment, the act of Congress, ^commonly called the fugitive slave law, is, in all of its provisions, fully authorized by the constitution of the Hnited States.”
In regard to the objection of “ obiter dicta,” urged in the argument to the authority of the Prigg case, I have simply to remark that the circumstances surrounding the prosecution of that ease, the real parties to it, the object they had in view, and the line of argument pursued, should, in a great degree, if not entirely, relieve it from the objection. At all events, some of the points were involved in the Yan Zandt case, and all, not covered by either of the others, were directly involved in one or more of the Wisconsin *168 cases, which, in this opinion, I have designated as the Booth case— there being more than one. In these Wisconsin cases, the court had before them, the printed arguments which had been used in the court below, and filed by the defendants in error, together with the opinions, seriatim, of the Wisconsin judges, in which the points now taken were fully discussed and decided. It would seem, then, in view of all these decisions, state and national, that if there ever was a case in which a question should be regarded as settled, the right of Congress to legislate as to fugitives from service should bo so considered.
It is said, however, that the law is so repugnant in its provisions that time can never legalize it, and that, inasmuch as the question can never be taken for reversal to the federal court, unless the state courts should declare the law invalid, we should continue so to decide, until the Supreme Court finally succumbs. But little progress seems to have been made thus far toward such a desired consummation. In 1842, one out of the nine judges held the law to bo invalid ; but in 1847, and again in 1858, they were unanimous; and in the case at bar, there can not be a doubt but that the final issue would be adverse to the relators, if we should now hold the law unconstitutional, as they desire. No lawyer can seriously qixostion but that *the Supreme Court of the United States, in virtue of the appellate jurisdiction secured to it by the constitution, article 3, section 2, and the judiciary act of 1789, would have the legal right, which they would undoubtedly exercise, to revise and reverse our decision. The only practical effect, then, of such a course would be to increase the number of decisions, already sufficiently numerous, in favor of the validity of the law, and thus to render more hopeless that final consummation, which the relators think they see in the distance.
If the question were now res integra, and we, unaided by the history of the constitutional provision, and uninformed as to previous decisions, long-continued use and contemporaneous exposition, were now called upon for the first time to determine the precise effect of that provision, and the power of Congress over the subject, it is probable that, in giving a strict construction to the constitution and the powers conferred by it, we might hold that Congress had no authority to legislate as to the reclamation of fugitives from service. But when we look at the provision in the light of the circumstances which led to its insertion, and the objects and *169 ¡purposes its framers had in view, remembering always that the act of 1793 was almost contemporaneous with the clause in question, .and the further facts that that law was acquiesced in for more than ■sixty years, during which period it was frequently called into exercise, and has been sustained by a long and unbroken line of decisions, state and national, affirming its validity, it would seem that no jurist could be warranted in pronouncing such a law unconstitutional and void. No law can or should be declared invalid “ unless its unconstitutionality is free from doubt — the violation palpable.” Armstrong v. Athens Co., 10 Ohio, 237.
If the argument as to the right of Congress to legislate as to fugitive slaves were not already overwhelming; I might also refer to the repeated recognitions of that right, to be found upon the .statute-books of the several states. *There are two early laws of this description among our Ohio statutes — a law passed .January 25, 1819 (2 Chase, 1052), and a law passed February 15, 1831 (3 Curwen, Eev. Stat. 2483). The preamble to the first act recites the passage by Congress of the law of February 12, 1793, and its provisions substantially, and then punishes, by imprisonment in the penitentiary, any one who attempts to remove out of the state such slave, without first proving his right, etc., agreeably to the act of 1793; and the second section of the act of 1831 is like that of 1819, except that it has no preamble nor express reference to the law of 1793; but requires the person attempting to remove ■a slave to first prove his right, “ agreeably to the laws of the United States.” Similar provisions could doubtless be found in the statutes of other states ; but I forbear. Enough, and more than enough, has been shown to establish a right that has been openly exercised .and acquiesced in for more than sixty-six years ; and 1 therefore assume that it is now too late to question the right of Congress to pass a law for the reclamation of fugitives from service.
Secondly, assuming that Congress has the power to pass a law for the reclamation of fugitives from service, had it power to pass .the law of 1850 ? The invalidity of this law is affirmed by reason •of its peculiar provisions :
1. Because it authorizes the extradition of fugitive slaves on proof of right made before the commissioner, without securing to the person seized a jury trial in the state where he is seized.
2. Because it violates the fourth article of the amendment in rear'd to unreasonable seizures.
*170 3. Because it violates the eighth amendment prohibiting the imposition of excessive fines and cruel and unusual punishments.
4. Because it creates a tribunal and clothes it with judicial powers, in a manner not warranted by the constitution of the United-States.
In the opinion just pronounced by his honor the Chief ^Justice, it is held that the questions, so far as they relate to the extradition of a fugitive from labor without affording him a jury trial in the state where he is seized, and the intervention of commissioners to issue the order of extradition, can not be raised in this collateral proceeding under the return made by the sheriff of Cuyahoga, which is simply that he now holds the relators by virtue of a mittimus reciting a conviction before and sentence of the district court, “ for rescuing a fugitive from service,” without more. The copy of the record is no necessary part of the mittimus, nor is it a document under and by virtue of which the sheriff holds the relator in custody. That we can not look into the record thus appended, nor hoar proof aliunde in this proceeding, to show the manner in which the fugitive was seized and detained by the master, nor the precise circumstances under which ho was rescued. Nor, indeed, can the relators be liberated under such a return upon habeas corpus, if under any circumstance such a rescue would be unlawful and punishable under the act of 1850. The uniform current of all the-authorities has heretofore been, and I am not aware of a single exception, that under the constitutional provision the master may, if he can do so without- a breach of the peace, take possession of his fugitive slave; and many other cases may bo supposed in which the custody of the owner for the time would be lawful, and which the relators would have no right to distui’b. If these positions of the Chief Justice are true, and it seems to me that they are so, the objections to the law of 1850, because it does not accord a jury trial to-the fugitive before his extradition, and permits a seizure and removal under warrant of a commissioner of the circuit court, can not avail the relators, even though those provisions should bo regarded as unconstitutional.
But is it true that those provisions are so clearly unconstitutional as to authorize this court to pronounce them, and the law in which they are incorporated, invalid?
*It certainly is not the case if the repeated decisions of the Supreme Court of the United States, the constitutional expounders *171 in the last resort, of the constitution and laws of the United States, are to be regarded and followed; as the eases of Prigg v. The State of Pennsylvania, Jones v. Van Zandt, and United States v. Booth, will clearly establish.
Nor are we without decisions of the highest state tribunals to the same effect.
C. J. Tilghman, in 5 Serg. & Rawle, supra, in reply to the claim that the party arrested was entitled to a jury trial, long before the-case in 16 Peters, says: “It plainly appears from the whole scope and tenor of the constitution and act of Congress that the fugitive waS to be delivered up on a summary proceeding, without the delay of a formal trial in a court of law.” “ But if he really had a right, to freedom, that right is not impaired by this proceeding.” The-Sims case, in 7 Cushing, supra, is also an authority in point. In that case Shaw, C. J., in a very elaborate opinion, noting the analogies between the acts of 1793 and 1850, and the decisions under-the law of 1793, holds not only that the commissioners may rightfully execute the powers confided to them by the act of 1850, but. also that the act is not an infringement of the constitutional guaranty of a jury trial, and assigns reasons somewhat similar to those-given by Tilghman, C. J. .
The extreme length to which this opinion has extended precludes-me following out this particular topic to greater length, and I merely refer to the cases heretofore cited from Wendell, Pickering, Barbour, and Barr, as also bearing upon the question, together' with 2 Story’s Comm., sections 1811 and 1812, and Sergeant on Cons. Law, 398, as sustaining and enforcing the same views as to-the validity of the law in these respects, and have merely to say that, in view of these authorities and the reasons by which they are supported, the act of 1850 is not, in my judgment, so clearly unconstitutional on either of these grounds as to authorize us so-to declare it, even if the question could properly arise. The ^question as to the legality of the acts of a commissioner ■ could not arise on the record in the case of Bushnell, as it does not appear that the person he aided to rescue was in custody under a commissioner’s warrant; nor can it well arise in the case of Langston, as only one count in the indictment against him charges a-rescue under such circumstances, the other count being general,, and a general verdict. One good count will authorize and support *172 ■conviction and sentence. Turk v. State, 7 Ohio, 240 (part 2); Bailey v. State, 4 Ohio St. 440.
It is also claimed that, inasmuch as it appears from the indictment, that the fugitive rescued was held to service in the State of Kentucky and not in one of the original states, that he was protected from arrest by virtue of the ordinance of 1787; which, after ■declaring the fundamental rule, that there should be no slavery nor involuntary servitude,- etc., in the territory northwest of the river Ohio, merely saves the right to recapture slaves escaping from ■the original thirteen states. Passing by, for the present, the question whether this point can be made at this time and in this proceeding, .and the further point, intimated by Justice Read, in State v. Hoppess, above cited, that the ordinance of 1787 was superseded by the ■constitution, it is sufficient for us to say, that the State of Kentucky was, at the passage of the ordinance, an integral part of the State •of Virginia, whose soil and inhabitants were protected by that in-strument. The area, from which slaves escaping into that territory might be recaptured, was not in any degree enlarged, and the State -of Kentucky, when organized, succeeded to all the rights of Vir..ginia, in this respect, of which it was a component part, when the ordinance was promulgated.
But it is claimed that the law is unconstitutional, because it interferes with the local police regulations of the state, and imposes severe pains and penalties upon citizens of the state where the •fugitive is apprehended.
These questions have not, that I am aware, been raised *hereiofore; but are, in my judgment, very easily answered. It after -all resolves itself into a more question of power in Congress to legislate at all, in regard to the reclamation of 'fugitives from service. If Congress has the power to regulate, by law, the demand and delivery of the alleged fugitive — to enforce the right of the owner and prohibit interference by others — it must necessarily follow that, to •the extent deemed necessary for the enforcement of the right and its corresponding duty, Congress may constitutionally interfere •with local police regulations of the several states, and to render their regulations effective, must, necessarily, have the constitutional power to impose fines, imprisonment, and other sanctions, upon a violation of the enactment.
It seems to us that the law in question is unnecessarily severe in Sts sanctions, and should have been conceived in a milder and more *173 humane spirit. More consideration ought to have been shown to-the alleged fugitive, in the ascertainment of his rights, before his-delivery to the claimant, and more respect evinced to the scruples, conscientious or otherwise, of the citizens of the state where he might be seized. It is not a question whether the law is just and expedient; but whether it is constitutional. Not whether an admitted right to legislate has been abused, or improperly exercised;but whether such poioer exists.
We have already come to the conclusion, that it is now too late-to deny that Congress had the power to legislate, and that, in our-judgment, disposes of the objection, that it interferes with the local police regulations of the states, and imposes fine and imprisonment upon those who disregard or disobey its provisions.
It would be idle to confer upon Congress the power to prescribe-the rules by which the master might reclaim his fugitive slave, and, at the same time, deny its right to impose any sanctions or penalt-ies upon those whb may interfere with or prevent the exercise of the powers thereby conferred upon the master. A law without sanctions for *its enforcement, would not be much regarded. The penalties are severe, but not so much so as to render-them obnoxious to this constitutional inhibition, though, I am free-to say, are sufficiently so to call for amendment on the part of the-law-making power.
The indictments under which the relators have been convicted! and sentenced, it is said, contained no averments to the effect t-hafc the slave rescued was hold-, to service in the State of Kentucky, “ under the laws thereof,” which is supposed to be essential to a. valid indictment under the statute; and it is claimed that this omission renders the conviction and sentence void, and that it is-, our duty, for this cause, to discharge the relators. It is not pretended that this court has appellate or revisory power over .the courts of the United States, to bring their judgments before us- and reverse them for errors apparent upon the record; but it-seems to be supposed that, in this summary way, we may do something very nearly akin to it. If a court has jurisdiction to try a cause, any errors committed by that court in the trial, though fatal on error, can not be collaterally examined. If, therefore, the district court had jurisdiction to try cases for the rescue of fugitives-from service within the State of Ohio, of which there is no doubt,, and had jurisdiction of the person of the party indicted, it is not, I. *174 «apprehend, very material for us to inquire whether all necessary ;and proper averments, descriptive of the offense, are contained in the indictment. With us, it is a question of jurisdiction acquired, .and not of jurisdiction abused — as to the right of the court to try .at all, and not as to errors occurring in the pleadings or the proofs.
The tribunals of the United States claim the exclusive and ultimate right, in all cases, to determine whether a law of Congress is • or is not constitutional, and that the state courts are concluded by ;such decision. Such a rule, if conceded, it is obvious, would prevent any and all possible collisions between the state and national authorities. *A11 would move on harmoniously in obedience to such ultimate rule; but it is equally true, that the reserved rights of the states would be at the mercy or forbearance of the federal government and its judiciary, and hence this claim has not been very cordially acquiesced in by the state tribunals. Indeed, for several years past, an apprehension has prevailed, that in the administration of the federal government, and in the federal judiciary, as the exponents of its powers and legislation, there is a •strong tendency to centralization and an absorjrtion of the reserved rights of the states. The state courts, having caught the popular ■infection, view with jealousy all the efforts of the various depart■ments of the general government, legislative, judicial, and executive, to enlarge their jurisdiction, or extend their prerogatives beyond the assumptions of former years; and accordingly some :state courts have not scrupled at times to resist all such aggressive •conduct on the part of the co-ordinate branches of the general ^government, claiming the constitutional right to do so; though in many cases it is not to be denied, that such resistance savors rather ■of revolution than of legitimate legislation or sound judicial expo■sition. The rule, as conceded by the state tribunals, seems to be ■that where the constitutionality of a law, or the action of the executive, is debatable or doubtful, the decision of the federal court, the ultimate arbiter under the constitution, of the powers and jurisdiction of the federal government, will be held binding and obligatory upon the state tribunals; but where Congress passes a law, or where the executive or the judiciary assumes a power ■clearly and undeniably unconstitutional, amounting to a gross and palpable violation of the constitutional rights of the citizen, or the reserved rights of the state, a state court, it is said, should never ¿hesitate to pronounce such a lawvoid, and, disregarding its affir *175 mation by the federal judiciary, to deliver from its grasp the citizen ■or state oppressed by it. The right thus claimed, if it can be said to exist, is akin to that of self-defense, and should never *be resorted to, nor destructive instrumentalities employed therein, except in great and overruling necessity. Nothing less than this, ■certainly, could justify a court, the upholder of law and the guardian of order, in revolutionary action. Many of the cases in which the right of the state courts to thus interfere and resist the federal judiciary, will be found collected and commented on in Hard on Habeas Corpus, pages 164 to 207. The question is a delicate one— one which it is not necessary for this court now to determine; for here, at least, there is no such gross and palpable violation as, under any rule, would justify such interference on our part.
We, as judges, owe a double duty and allegiance; one to the state in which we live, and the other to the general goverment, of. which it is a component part; a duty to the general goverment, to see that its constitution is unimpaired, its laws vindicated, and its general welfare promoted; a duty to the state in which we live, to see that its constitution and laws also are not violated, that all just rights of our fellow-citizens are acknowledged and • enforced, and that peace, good order, and harmony are preserved. In theory, so far as regards any conflicting rights, this may be effected by confining the state and national authorities each within its peculiar and appropriate sphere; and this would be comparatively easy of accomplishment, if there was one common and paramount head to direct and control both governments- — one ultimate tribunal whose decision is binding upon all. But where each claims to be not only supreme within its own orbit, but also the exclusive judge for itself, of its own powers and jurisdiction, and where party politics and party spirit enter so largely into the frame-work of our laws, those who may be called upon to execute or expound them, whether state or national, will sometimes find themselves in embarrassing and difficult positions, requiring extreme prudence and forbearance to avert disastrous and disorganizing results; positions in which it behooves the judge or executive officer, *sworn to support the constitution and laws of both confederacies, to pause and determine how he is to act, so as best to fulfill his sacred obligations. In determining whether a law of Congress is constitutional or not, how is the judge to act? Is he to look at it as a mere abstract question, not involving in its solution the peace and prosperity of *176 the Union, or the good order and well-being of society? Is he to-ignore his duty to one government or the other, and if so, to-which ? As tó which of these governments is he to be foresworn ? Is he to pay no regard to the opinions of others; none to long-continued usage; to regard each question as res integra uninfluenced by previous determinations, and unaffected by former practice?' Or should he not rather, mindful of his varied obligations and his-own liability to err, seek to so expound the law as will best sub-serve those obligations; to doubt his own infallibility, when he-finds that others before him have come to different conclusions, and in cases where the constitutionality of a law is thus rendered doubtful, to suffer it to remain, and especially so, when a contrary ruling would have the effect of bringing about a conflict of jurisdiction, and thereby embroil the two governments? Is is not apparent that, by pursuing the latter course, he will best fulfill his-obligations to both governments and promote the peace and the-welfare of the whole people?
Boldness may attract the inconsiderate and the rash, and the politician in his selfishness may for the time applaud whatever ministers to his interests; but the considered approval of the wise- and the good will never follow any one who really, but without sufficient cause, endangers the perpetuity of our Union. Sooner or later, their reprehension will surely overtake all who, unnecessarily, place it in hazard. If the revolution, alluded to in the argument, must come, let it not be precipitated by the courts ! If the arch of our Union is to be broken into fragments, let other heads and other hands than ours inaugurate and complete the Yandal work!
*For the reasons assigned, I concur in the order remanding-the relators into the custody of the sheriff of Cuyahoga county, until otherwise discharged by due course of law.
Brinkerhoff, J.
Since the close of the argument of these cases. —Sunday, and a visit to my family intervening — I have not had time to do more than hastily to sketch a brief outline of my opinion on the questions they present. This I give; and I may and may not, as leisure or inclination may prompt, commit them to-paper, with the reasons on which they rest, more fully and in detail hereafter.
I. Under the advice of the district attorney of the United States, *177 the indictments under which the relators were convicted, are appended to, and form a part of, the return to these writs. The question whether they charge a crime or not, is therefore before us. Eoth indictments are fatally defective, in this, to wit, that neither of them aver that John was held to service or labor in the State of Kentucky “under the laws thereof.” See. 2, art. 4, Constitution United States.
1. This defect is not a mere error or irregularity. If it were, so far as this point is concerned, we should be obliged to remand the prisoners; for the writ of habeas corpus can not be made to perform the functions of á writ of error. Eut 2. This defect is an illegality. The averment omitted is of the essence of the crime; without the fact omitted to be averred, there is no crime; for it is no crime to rescue from custody a person held to service or labor in another state otherwise than “under the laws thereof.” If there was no crime charged in the indictment, the judgment of the district court of the United States, under which the relators are held, is coram non judice and void; they are illegally restrained of their liberty, and they ought to be discharged,
II. 1. The indictment against Bushnell contains but one count, *which charges the rescue of John from the custody of an agent of the claimant of his labor and service in Kentucky, John having been arrested and held in custody without warrant or any color of legal process.
It appears, then, on the face of the record, which is made a part of the return to this writ, that here was a person domiciled or sojourning in Ohio, a free state, and therefore presumed in law to be a free man, “ unreasonably seized ” and “ deprived of his liberty,” not only “without due process of law,” but without the pretense or color of any process whatever. This arrest and custody was in direct contravention of the fourth and fifth articles of the amendments to the constitution of the United States. The rescue of a person thus “unreasonably seized” and “deprived of his liberty without due process of law,” can not be a crime; and any statute or judicial procedure which attempts to make or treat it as a crime is unconstitutional and void.
2. The indictment against Langston has two counts, the first of which is entirely similar to that against Bushnell, and the second of which alleges a similar rescue of John while arrested and held in custody under a warrant issued by a commissioner of the circuit *178 court of the United States, authorized by act of Congress to issue such warrant, and under the authority thereof, to arrest, hold, and remove the person described therein to a foreign jurisdiction as a slave.
The acts of Congress referred to, clearly attempt to confer on these commissioners the powers and functions of a court, to hear and determine questions of law and of fact, and to clothe their findings and determinations with that conclusive authority which belongs only to judicial action. And the issue of the warrant mentioned in the indictment was a judicial act.
These provisions of the acts of Congress referred to, and all warrants issued under them, are unconstitutional and void, for the following reasons:
*These commissioners are appointed by the circuit courts of the United only; hold their office at the will of such courts; and are paid by fees. Whereas, by the express provisions of the constitution of the United States (art. 2, sec. 2, and art. 3, sec. 1), the judicial functionaries of the United States must be appointed by the president, by and with the advice and consent of the senate, hold their office during good behavior, and receive a fixed compensation, which may not be diminished during their continuance in office.
The warrant of such a commissioner therefore is a nullity; it could afford no authority to hold John in custody; and to rescue him from such illegal custody could not, by the law of the land, be a crime; and therefore the imprisonment of Langston by way of punishment of such pretended crime, is an illegal restraint of his liberty, and he too ought therefore to be discharged.
III. These relators ought to be discharged because' they have been indicted and convicted under an act of Congress upon a subject-matter in reference to which Congress has, under the constitution of the United States, no legislative power whatever.
As to the correctness of this proposition, there does not rest on my mind the shadow or glimmer of a doubt.
The federal government is one of limited powers; and all powers not expressly granted to it, or necessary to carry into effect such as are expressly granted to it by the terms of the constitution, are reserved to the states or the people. Amendments, art. 10.
“ No person held to service or labor in one state, under the laws thereof, escaping into another, shall, in consequence of any law or *179 regulation therein, be discharged' from such service or labor, but shall be delivered up on claim of the party to whom such service or labor may be due.” Art. 4, sec. 2.
This is the only clause of the constitution from which anybody ^pretends to derive, or in which anybody pretends to find, a grant of power to Congress to legislate on the subject of the rendition of fugitives from labor. I can find it in no such grant. The first part of it simply prohibits state legislation hostile to the rendition of fugitives from labor. Such fugitive shall not be discharged “ in consequence of any law or regulation ” of the state into which he shall escape. “But shall be delivered up.” By whom? By Congress? By the federal authorities? There areno such words, and no such idea is hinted at. This is evident from an inspection of the whole of the preceding portion of this article.
Art. 4, sec. 1: “ Full faith and credit shall be given in each state to the public acts, records, and judicial proceedings of every other state. And the Congress may by general laws prescribe the manner in which such acts, records, and proceedings shall be proved, and the effect thereof.” Here, in the first place, is a compact between the states respectively — an agreement of the several states to and with each other, that the “ public acts, records, and judicial proceedings ” of each shall have “full faith and credit” given to them in all. Had this section closed here, would any one claim that it embraced any grant of legislative power to Congress? I think not. But the framers of the constitution thought that Congress ought to have the power “to prescribe the manner in which such acts, records, and proceedings should be proved, and the effect thereof; ” and hence they gave the power in express terms. When they intended a grant of power to Congress, and not a mere contract stipulation by, or injunction of duty upon, the states, they say so, and leave us no room for cavil on the subject. But let us go on :
“ Seo. 2. The citizens of each state shall be entitled to all privileges and immunities of citizens in the several states.
“ A person charged in any state with treason, felony, or other *crime, who shall flee from justice, and be found in another state, shall, on demand of the executive authority of the state from which he fled, be delivered up, to be removed to the state having jurisdiction of the crime.”
That these clauses of section 2 are mere articles of compact between the states, dependent on the good faith of the states alone *180 for their fulfillment, I suppose no one will dispute. They do not confer upon Congress any power whatsoever to enforce their observance. Then follows the last clause of section 2, in respect ta fugitives from labor or service, first quoted; and this, like all the other preceding clauses of this article, except the first, is destitute of any grant of power, or even allusion to Congress or the federal government. Now, if a grant of ¡lower to Congress was here intended, why this silence? If the framers of the constitution intended a grant of power to Congress in this clause, why did they not say so, as they did say in section 1, in respect to “public acts, records, and judicial proceedings?”
It seems to me that no rational answer can be given to this question, except by a denial of such intention. Hxpressio unius, exclusio alterius, is a legal maxim, as old as the common law. The express mention of one thing implies the exclusion of things not mentioned. It is the dictate of reason and common sense. It is a maxim which applies alike in the interpretation of contracts, statutes, and constitutions. Its application was never more obviously proper than to the question before us; and when applied, it seems to me to bring with it a force little short of mathematical demonstration.
Thus far I have reasoned as if we were ignorant of the history of the constitution; but a glance at that history confirms the conclusions to which we are brought by the ordinary rules of interpretation, and makes “assurance doubly sure.”
The articles of confederation, under which the struggle *for independence was carried through, and for which the present constitution of the United States is a substitute, contained nothing but' articles of compact. The fulfillment of its obligations was dependent upon the faith of the states alone. The Congress could make requisitions, but had no power to enforce them.
Again: Certain provisions of the ordinance of 1787, for the government of the territory northwest of the Ohio river, were in express terms declared to be “articles of compact.”
Now, every one of the clauses of the 4th article of the constitution above quoted, were borrowed and transferred, with but slight verbal alterations, from the articles of confederation and the ordinance of 1787 (the first three from the former, and the last from the latter), with this exception only, that to the first of these clauses was added a grant of power to Congress to prescribe the manner of proof and effect of public acts, records, and judicial proceedings. Here, then-,. *181 -we have certain articles of compact (admitted or declared to be auch, and nothing more), borrowed and transferred from one instrument to another, with no intimation of any change of their character as articles of compact, except in a single instance where the change is expressly declared. The inference seems to me to be irresistible, that except so far as the change is expressly declared, they remained, after the transfer, the same as they were before — articles of compact, and nothing else.
I conclude, therefore, that the states are bound, in fulfillment of their plighted faith, and through the medium of their laws, legislation, and functionaries, to deliver up the fugitive from service or labor, on claim of the party to whom such service or labor may be due under the laws of another state from which the fugitive has fled. But the federal government has nothing to do with the subject, and its interference is sheer usurpation of a power not granted, but reserved.
*But, it is said, the question is settled, and our argument •comes too late. I deny that it is settled.
The federal legislature has usurped a power not granted by the constitution, and a federal judiciary has, through the medium of reasonings lame, halting, contradictory, and of far-fetched implications, derived from unwarranted assumptions and false history, sanctioned the usurpation. I deny that the decisions of a usurping party in favor of the validity of its own assumptions, can settle anything. It is true that the courts and legislatures of several of the states have decided in the same way; but they have been decisions of acquiescence rather than of original and independent inquiry. The fact that such jurists as Hornblower, Walworth, and Webster thought on this subject as I think, shows that the question is not settled. The fact that a majority of my brethren, as I understand them, admit that if this were a new question, they would be with me, and that they-yield the strong leanings of their own minds to the force of the rule of res adjudicata alone, proves that this question is not settled. The truth is, it is not until recently that the mass of intelligent and inquiring mind in this country has been brought to bear upon this question. It required the enactment and enforcement of the fugitive slave act of 1850, overriding .the most, sacred and fundamental guarranties of the constitution, and disregarding in its provisions even the decencies of legislation, as if for the very purpose of irritation and humiliation, and the *182 fine and imprisonment under it of white men for the exercise of the instinctive virtues of humanity, to awaken general inquiry. That inquiry is now going forward. And so surely as the matured convictions of the mass of intelligent mind in this country must ulti-, mately control the operations of government in all its departments, so surely is this question not settled. When it is settled right, then it will be settled, and not till then.
But, contemporaneous construction is appealed to. I admit its weight, and its title to respectful consideration. *But contemporaneous construction speaks with a divided voice. It is true, Congress as early as 1793, legislated for the return of fugitives from labor. But nearly, if not quite, every one of the old states had also legislated on the same subject in fulfillment of what they deemed a matter of constitutional obligation resting on them. And such legislation on the part of the states, old and new, continued until the Supreme Court of the. United States, in the Prigg case, as late as 1842 (16 Peters, 539), assumed for the federal government exclusive.authority over the subject. And those who appeal' to contemporaneous construction should themselves respect it. From the foundation of the government until within the last ten years, Congress claimed and exercised, without question, full and complete legislative power over the territories of the United States ; and as early as 1828, in American Insurance Company v. Canters, 1 Peters, 546, the Supreme Court of the United States, Chief Justice Marshall delivering its opinion, unanimously decided that in the territories Congress rightfully exercises the “ combined powers of a general and of a state government.” Yet, in the recent case of Dred Scott v. Sandford, 19 Howard, 393, all this is overturned and disregarded, and the whole past theory and practice of the government in this respect attempted to be revolutionized by force of a judicial ipse dixit. We are thus invited by that court back to the consideration of first principles ; and neither it nor those who rely on its authority have a right to complain if we accept the invitation .
I know no way, other than through the action of the state governments, in which the reserved rights and powers of the states can be preserved, and the guaranties of individual liberty be vindicated. The history of this country, brief as it is, already shows that the federal judiciary is never behind the other departments of that government, and often foremost, in the assumption of non- *183 granted powers. And let it be finally yielded, that the federal government is, in the last resort, the authoritative judge *of the extent of its own powers, and the reservations and limitations of the constitution, which the framers of that instrument so jealously endeavored firmly to fix and guard, will soon be, if they are not already,' obliterated; and that government, the sole possessor of the only means of revenue, in the employment of which the people can be kept ignorant of the extent of their own burdens, and with its overshadowing patronage, attracting to its support the ambitious by means of its honors, and the mercenary through the medium of its emoluments, will speedily become, if it be not already, practically omnipotent.
These were my opinions, freely declared, for years before I had the honor of a seat on this bench; and, having learned nothing during the pendency of these cases to change, but much to confirm, them, I know no reason why I should hesitate to'avow them now.
I give my voice in favor of the discharge of the relators.